UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

31 WAYNE AVENUE, LLC,

                          Plaintiff,                    **DECISION AND ORDER**

         -against-                              22 Civ. 4764 (AEK)

CRST LINCOLN SALES INC., CRST
EXPEDITED, INC., and JARRED RAY
BAGLEY,

                          Defendants.
---------------------------------------------------------------X

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

      Plaintiff 31 Wayne Avenue, LLC ("Plaintiff") brought this negligence action against Defendants CRST Lincoln Sales Inc., CRST Expedited Inc., and Jarred Ray Bagley ("Defendants"), alleging that on December 26, 2019, a tractor trailer owned and/or operated by Defendants struck a stone wall on Plaintiff's property and caused property damage. ECF No. 31 (Amended Complaint or "Am. Compl."). Defendants conceded liability, and the parties proceeded to trial for the sole purpose of determining damages. *See* ECF No. 35 ("Proposed Joint Pretrial Order") at 2. For the reasons that follow, the Court finds that Defendants are liable to Plaintiff in the amount of $22,562.98.

---

[1] The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c). ECF No. 12.

## PROCEDURAL HISTORY

This action was initiated by the filing of a complaint in the Supreme Court of the State of New York, Rockland County on April 29, 2022.[2]  *See* ECF No. 1-1.  On July 7, 2022, Defendants removed the case to federal court based on the diversity of citizenship among the parties, pursuant to 28 U.S.C. §§ 1332, 1441(b), and 1446.  ECF No. 1.  The parties unsuccessfully engaged in mediation, *see* ECF No. 32, and a bench trial was scheduled for September 18, 2023, *see* ECF No. 34.  Prior to trial, both sides submitted proposed findings of fact and conclusions of law.  ECF Nos. 36, 37.  At trial, two witnesses testified on behalf of Plaintiff—Mr. O'Hanlon, the majority owner of 31 Wayne Avenue, LLC; and James Cheeseman, the owner of the construction company that assessed the damage to Plaintiff's property and provided Plaintiff with an estimated cost of repairs.  Gerard Fitzpatrick, who owns a different construction company and provided a competing repair estimate to Defendants, testified on behalf of Defendants.

## FINDINGS OF FACT

The Court makes the following findings of fact as required by Rule 52 of the Federal Rules of Civil Procedure.

### I.    The Parties and the Incident

Plaintiff owns the property located at 31 Wayne Avenue in Suffern, New York (the "Property"), and Mr. O'Hanlon is the majority member of the plaintiff LLC.  Tr. 6:8-17.  The Property is comprised of a house, a yard, and the surrounding stone retaining wall (the

---

[2] The named plaintiff in the original complaint was Troy O'Hanlon, who was described in the pleading as the owner of the property located at 31 Wayne Avenue, Suffern, New York. *See* ECF No. 1-1 ¶ 2.  During discovery in this case, however, it became clear that the property was purchased in 2016 by Plaintiff, with Mr. O'Hanlon as the majority member of the LLC.  *See* Trial Transcript ("Tr.") 6:8-23; ECF No. 26.  Accordingly, and with the consent of Defendants, the complaint was amended to substitute 31 Wayne Avenue, LLC for Mr. O'Hanlon as the Plaintiff.  *See* ECF No. 28; Am. Compl.

"Retaining Wall"), located at the corner of Wayne Avenue/U.S. Route 202 and Chestnut Street in Suffern. *See* Tr. 8:17-22, 33:18-33:6; Defs. Exs. 4, 5[3] (Google Maps images of the Property and the Retaining Wall). Plaintiff purchased the Property in 2016. Pl. Ex. 6 (deed of sale). As of the date of the trial, the house and the Retaining Wall were over 100 years old. *See* Tr. 17:16-21. Mr. O'Hanlon also owns an auto body shop located immediately across the street from the Property, and has been working at that location on and off since 1980. *See* Tr. 7:17-8:7. He has not made any repairs to the Retaining Wall since purchasing the Property in 2016, and prior to that time, he never observed any repairs being made. Tr. 7:7-11, 9:2-7, 18:2-5.

On December 26, 2019, a tractor trailer owned and/or operated by Defendants struck the corner of the Retaining Wall at the intersection of Wayne Avenue/U.S. Route 202 and Chestnut Street, causing damage to the Retaining Wall. *See* Pl. Ex. 1; *see also* Proposed Joint Pretrial Order at 2 (conceding Defendants' liability). Photographs taken in the immediate aftermath of the incident show stones from the Retaining Wall—some of which were very large—dislodged and strewn about the sidewalk and in the road. *See* Pl. Ex. 5. After the incident, traffic cones were placed around the portion of the Retaining Wall that was damaged, and the stones that had become dislodged were cleared away. Tr. 12:13-13:6; *see also* Pl. Ex. 5 (photos of Retaining Wall with traffic cones).

Since the December 26, 2019 incident, no repairs have been made to the Retaining Wall, *see* Tr. 15:4-21, 27:25-28:4, and neither party introduced any evidence to suggest that the Retaining Wall has degraded any further since the incident.

---

[3] "Pl. Ex. __" and "Defs. Ex. __" refer to exhibits received in evidence at trial. At the outset of the trial, the parties stipulated to the admission of all proposed exhibits. *See* Tr. 3:9-4:10.

## II. Plaintiff's Estimate of the Repair Cost

In February 2020, Mr. O'Hanlon contacted a construction company, West Gate Construction Services Inc. ("West Gate"), for the purpose of reviewing the damage to the Retaining Wall and preparing an estimate of the cost of repair. Tr. 16:1-22;[4] *see* Tr. 60:10-13. West Gate is a construction company licensed in Rockland County that performs construction, maintenance, stonework, and masonry work. Tr. 30:13-18, 31:5-17. The company maintains a classification and certification that allows it to perform work on retaining walls in Rockland County, and Mr. Cheeseman testified that one of West Gate's specialties is "hand crafted stone walls." Tr. 30:13-18, 31:12-17. West Gate is owned by Mr. Cheeseman. Tr. 30:11-18.

Mr. Cheeseman responded to Mr. O'Hanlon's request, assessed the damage, and provided Mr. O'Hanlon with an estimate of the cost to repair the Retaining Wall. *See* Tr. 33:15-34:6. At the time he prepared his estimate, Mr. Cheeseman had no knowledge of the condition of the Retaining Wall prior to the incident on December 26, 2019. Tr. 63:9-11; *see* Tr. 63:23-64:5.

Mr. Cheeseman's estimate is comprised of 21 line items, which add up to a total repair cost of $80,957.59. Pl. Ex. 2. Mr. Cheeseman testified about a handful of these items at trial. He explained what he believed would be required to complete this repair job, including the process of preparing the work environment and reconstructing the Retaining Wall. *See* Tr. 45:7-48:23. He also explained that based on his assessment, the repair job would take two weeks to finish and would require flaggers to ensure the safety of the worksite, given that the Property is located at a busy intersection. Tr. 34:17-23, 76:2-6. Other line items, however, were not

---

[4] Though Mr. O'Hanlon testified that he contacted "West Gate Landscaping," Tr. 16:1-2, the Court finds, based on Mr. Cheeseman's testimony and the document from West Gate that was received in evidence, that the company is called "West Gate Construction Services Inc.," *see* Pl. Ex. 2; Tr. 30:11-18.

4

explained during trial. For example, Mr. Cheeseman's estimate contemplates spending $2,760.39 on a picket fence (line item #16), $1,297.80 to water a new lawn (line item #19), $2,058.30 to tear out and dispose of five trees (line item #1), and $3,251.26 to replace five trees (line item #15). Pl. Ex. 2. Plaintiff did not present any evidence regarding how these items relate to repairing the damaged Retaining Wall.

Mr. Cheeseman also testified that he would not be able to repair only the corner of the Retaining Wall where Defendants' vehicle created the damage; rather, he testified that he would need to "realign" the entire Retaining Wall so as to remedy portions of the Retaining Wall that were "leaning" away from the Property and towards the sidewalk. Tr. 42:6-24, 51:14-52:11; *see also* Tr. 35:16-37:2 (explaining that portions of the wall along both Chestnut Street and Wayne Avenue were "way out of whack"). Mr. Cheeseman testified that the lean along Chestnut Street was "more severe towards the impact area . . . and it dissipated as it went down the wall." Tr. 67:4-11. Based on his observations, Mr. Cheeseman determined that the Retaining Wall was "compromised" and a "total loss" and the lean would need to be fixed to prevent the Retaining Wall from "fall[ing] down." Tr. 42:6-24, 76:14-19, 79:21-80:19. Mr. Cheeseman also explained that his assessment was based on his concern that once work begins, "you don't know what you're getting into" and that "[s]ometimes you start pulling this wall down and another 10 feet comes down with it." Tr. 79:21-25.

Mr. O'Hanlon accepted Mr. Cheeseman's estimate without question. Mr. O'Hanlon did not seek out a second opinion as to the cost of repairing the Retaining Wall, nor did he inquire about the necessity of the 21 line items included in Mr. Cheeseman's estimate. Tr. 19:3-19. Mr. O'Hanlon also did not ask any engineers to provide an opinion as to the "lean" in the Retaining Wall—either with respect to whether the lean could have been caused by the tractor trailer, or as

to Mr. Cheeseman's opinion that repairing the Retaining Wall would require remedying the lean. Tr. 18:16-22, 64:6-15.

### III.  Defendants' Estimate of the Repair Cost

On July 1, 2020 and August 10, 2021, an adjuster from Associated Adjusters Network inspected the Property on behalf of Defendants' insurer.  Defs. Ex. 6.  The adjuster estimated the cost of repair to be $ 5,230.73 based on his initial observation, and increased his estimate to $8,092.70 following a second site visit.  *See* Defs. Ex. 7.  The adjuster also reviewed Mr. Cheeseman's $80,957.59 estimate and noted in a report that Mr. Cheeseman's estimate was "highly unreasonable" due to the extent of repairs contemplated and the "many unrelated fees."  Defs. Ex. 6 at 1.

In connection with this litigation, Defendants contacted Gerard Fitzpatrick, the owner of Fitzpatrick Masonry LLC, to provide an additional estimate of the cost of repairing the Retaining Wall.  *See* Tr. 90:2-5.  Mr. Fitzpatrick is a masonry contractor specializing in stone, brick, block, concrete, and tile work.  Tr. 90:2-18.  Mr. Fitzpatrick did not visit 31 Wayne Avenue before rendering his estimate; instead, he relied on photographs of the Property and the Retaining Wall. Tr. 91:14-18; *see also* Tr. 93:15-20.  Based on his review of those materials, Mr. Fitzpatrick estimated the cost of repairing the damaged portion of the Retaining Wall to be $14,400.00.  Pl. Ex. 3.

Mr. Fitzpatrick's estimate includes a description of the work that would be required to repair the Retaining Wall, followed by three line items: "FOOTING $1800.00"; "WALL $45.00 PER SQF $9000.00"; and "GRAVEL AND BACKFILL WITH DRAIN PIPE $3600.00."  Pl. Ex. 3.  At trial, Mr. Fitzpatrick explained the shorthand in his estimate, and stated that his estimate includes labor costs for three workers working for three days.  *See* Tr. 92:25-97:8,

6

104:3-13.  According to Mr. Fitzpatrick, the corner of the Retaining Wall that was damaged by the tractor trailer could be repaired without also addressing the "lean."  *See* Tr. 102:9-12.

Certain portions of Mr. Fitzpatrick's testimony were confusing and difficult to reconcile. He testified that his estimate does not contemplate purchasing any additional stone, and instead is priced for a situation in which "the stones are there on set and you can . . . clean them and stuff like that."  Tr. 95:11-18.  But Mr. Fitzpatrick then stated that "you need a certain amount of new stone" for this project and that bringing in "a certain amount, just what's missing" is included in his quoted price.  Tr. 96:2-97:5.  Additionally, unlike Mr. Cheeseman's estimate, Mr. Fitzpatrick's estimate does not specifically itemize any spending for worksite safety.  Although Mr. Fitzpatrick testified that his estimated price includes flaggers, he quickly clarified that he does not believe this project needs flaggers, and that in fact, "road cones and caution tape is all you need here" to ensure a safe worksite.  Tr. 119:3-120:1.

Days before trial, Mr. Fitzpatrick visited the Property and observed the current state of the damage to the Retaining Wall.  Mr. Fitzpatrick described the wall as "very old" appearing. Tr. 98:15-25.  He also stated that other than the corner, he did not observe any further damage to the Retaining Wall.  Tr. 98:21-99:4.  While Mr. Fitzpatrick also observed "leans" in the Retaining Wall, he described those leans as "25, 30 feet away" from the damaged corner.  Tr. 101:9-16.

* * * * * * * * * *

**IV.     Credibility Findings Regarding Repair Costs**

Based on the totality of the evidence submitted, and after weighing the credibility of the witness testimony, the Court concludes that Mr. Cheeseman's estimate goes well beyond what is necessary to repair the damaged corner of the Retaining Wall.  While the Court credits certain portions of Mr. Cheeseman's testimony, Mr. Cheeseman's overall conclusion—that the

7

Retaining Wall is a "total loss" and must undergo extensive repairs[5]—is not credible. *See* Tr. 79:21-80:19. The Court does not credit Mr. Cheeseman's testimony regarding the extent to which a "lean" has compromised the wall. According to Mr. Cheeseman, he observed a "severe" lean "towards the impact area," *i.e.*, the corner, Tr. 67:4-11; but this assessment is not borne out by the photographs in evidence, and is contradicted by Mr. Fitzpatrick's more credible testimony that any leans in the Retaining Wall were "25, 30 feet away" from the damaged corner, *see* Defs. Ex. 6 at "Photo Sheet" pgs. 5, 8; Tr. 101:9-16. According to Mr. Cheeseman, this purportedly expansive lean must be addressed and the wall "realign[ed]" to prevent portions of the Retaining Wall beyond the damaged corner from "fall[ing] down" or "collaps[ing]." Tr. 76:14-19, 80:11-19. But this assessment is purely speculative, as Mr. Cheeseman is not a structural or civil engineer. *See* Tr. 18:16-22, 64:6-15. Moreover, his conclusion is contradicted by the fact that in the nearly four years since the incident, there have been no apparent issues with the Retaining Wall and no evidence of any collapse of any portion of the wall, notwithstanding that no repairs have been made. *See* Tr. 15:4-21, 27:25-28:4. Finally, Mr. Cheeseman's over-$80,000 estimate is based on conjecture that once work repair work begins on the Retaining Wall, "you don't know what you're getting into" and that "[s]ometimes you start pulling this wall down and another 10 feet comes down with it." Tr. 79:21-25.

Additionally, Mr. Cheeseman's estimate includes various line items that are not credibly within the scope of repairing the damaged wall. As discussed above, Mr. Cheeseman's estimate contemplates spending over $8,000 to tear out and replace trees and install a picket fence. *See* Pl. Ex. 2. It is apparent from the photographic evidence, however, that neither trees nor fencing

---

[5] The Court questioned Mr. Cheeseman regarding precisely how much of the Retaining Wall required repairs according to his estimate. Mr. Cheeseman responded that he could not recall "specifically where [repairs] would start and stop," but that at the very least, his estimate covered the entirety of the Retaining Wall visible in Defendants' Exhibit 5. *See* Tr. 49:7-52:11.

are located anywhere near the damaged corner of the Retaining Wall, and Plaintiff failed to show that any necessary repairs would impact these items.  *See* Pl. Ex. 5.

The Court credits the testimony of Mr. Fitzpatrick that repairing the corner of the Retaining Wall does not require servicing the entire wall.  Mr. Fitzpatrick credibly testified that his estimate accounts for repairing the corner of the Retaining Wall that was damaged by the tractor trailer.  *See* Tr. 102:9-12.  Unlike Mr. Cheeseman, Mr. Fitzpatrick did not incorporate the costs of what could possibly go wrong during the course of repairs into his estimate.  Moreover, Mr. Fitzpatrick's testimony concerning the extent of the damage to the Retaining Wall is supported by the numerous photographs received in evidence showing that the Retaining Wall is missing a corner, but otherwise appears to be in stable condition.  *See* Tr. 98:21-99:4; *see also* Pl. Ex. 5; Defs. Ex. 6 at "Photo Sheet" pgs. 4-5, 8-15.

Even with these findings regarding the amount of wall in need of repair, the Court finds other aspects of Mr. Cheeseman's testimony to be credible.  Specifically, Mr. Cheeseman credibly testified that certain measures must be taken to ensure a safe worksite while repairing the Retaining Wall.  The Property is located on a busy road, and at an intersection, where there is substantial vehicular and pedestrian traffic.  *See* Tr. 33:18-34:6 ("[I]t's a very, busy road.  It's 202.  There's a tremendous amount of traffic.").  The Court credits Mr. Cheeseman's determination that flaggers will be necessary to ensure a safe worksite, and that the cost of such labor must be incorporated into the overall repair cost for the Retaining Wall.  In contrast, the Court does not find credible Mr. Fitzpatrick's statement that flaggers are not required for this sort of construction job.  *See* Tr. 119:3-120:1 ("I think road cones and caution tape is all you need here.").  And in light of Mr. Fitzpatrick's testimony that flaggers are not even needed at this jobsite, it defies logic for Mr. Fitzpatrick to also suggest that the cost of flaggers is included in his overall estimate, *see* Tr. 118:21-119:17; the Court finds that testimony wholly incredible.

Finally, the Court also does not credit Mr. Fitzpatrick's testimony regarding the extent to which he considered the cost of new stone in rendering his estimate. Rather, the Court accepts Mr. Fitzpatrick's initial statement that the pricing in his estimate—$45 per square foot for the wall—is for instances in which "the stones are there on set and you can . . . clean them"; in contrast, if new stone is needed ("if I have to buy the stones"), Mr. Fitzpatrick would price the job at $100 per square foot, substantially more than he has estimated here. *See* Tr. 95:11-18. It is clear that neither of the cost extremes referenced by Mr. Fitzpatrick is exactly correct for the repair of the Retaining Wall here, which would include both some new stone and some reused stone. Notably, both Mr. Cheeseman and Mr. Fitzpatrick testified that new stone is needed to properly repair the Retaining Wall, *see* Tr. 47:3-16, 96:2-8, but only Mr. Cheeseman's estimate appropriately includes a line item for "granite blocks to replace missing section," priced at $2,601.00, Pl. Ex. 2.

## CONCLUSIONS OF LAW

### I.      Jurisdiction

There is no dispute that the Court has subject matter jurisdiction over this action because there is complete diversity of citizenship among the parties, and the amount in controversy as alleged in the Complaint is in excess of $75,000. *See* 28 U.S.C. § 1332(a)(1); Proposed Joint Pretrial Order at 1. Plaintiff is a citizen of the State of New York, while Defendants CRST Lincoln Sales Inc. and CRST Expedited, Inc. are Iowa corporations with their principal offices in Iowa, and Defendant Bagley is a citizen of North Carolina. Moreover, Plaintiff has claimed $80,957.59 in damages. *See* ECF No. 1 ¶ 11; Proposed Joint Pretrial Order at 3.

## II. Negligence Damages

### A. Legal Standard

"New York state law applies to this tort action because a federal court sitting in diversity applies the law of the forum state and because New York is the state where the tort occurred." *Velez v. Sebco Laundry Sys., Inc.*, 178 F. Supp. 2d 336, 339 (S.D.N.Y. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938); *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)).

Pursuant to New York law, the "proper measure of damages for permanent injury to real property is the lesser of the decline in market value and the cost of restoration." *Jenkins v. Etlinger*, 432 N.E.2d 589, 590-91 (N.Y. 1982). A "plaintiff need only present evidence as to one measure of damages, and that measure will be used when neither party presents evidence going to the other measure." *Id.* at 591. When assessing restoration costs, the proper measure of damages is "the reasonable cost of repairs necessary to restore [the property] to its former condition." *Fisher v. Qualico Contracting Corp.*, 779 N.E.2d 178, 180 (N.Y. 2002). Here, the parties agree that the proper measure of damages is the reasonable cost of repairs necessary to restore the Retaining Wall to its former condition, Proposed Joint Pretrial Order at 2, and have presented evidence only as to that measure of damages.

The reasonable cost of repairs "must never exceed the value of the [property] itself as it was before the injury" since "[t]he plaintiff should not benefit by the loss." *Gass v. Agate Ice Cream, Inc.*, 190 N.E. 323, 324 (N.Y. 1934); *accord Fisher*, 779 N.E.2d at 181-82. Generally, evidence of what was actually spent repairing property may establish the reasonable cost of repairs. *See, e.g.*, *Babbitt v. Maraia*, 549 N.Y.S.2d 791, 791 (2d Dep't 1990); *Moore v. Metro. St. R.R. Co.*, 82 N.Y.S. 778, 778 (2d Dep't 1903) ("It has been held that the evidence as to the cost of repairs upon injured articles, supported by the evidence of the person who made the

repairs . . . that the charges therefor[e] were reasonable, is legal proof of damages in an action for such injuries."). Where repairs have yet to be made, "a court may find that an itemized and detailed estimate has probative weight." *N.Y.C. Transit Auth. v. Horner*, 873 N.Y.S.2d 513 (Table), 2008 N.Y. Slip Op 52277(U), at *2 (N.Y. Civ. Ct. 2008); *see also Tanmar Serv. Corp. v. Yuen*, 722 N.Y.S.2d 357, 358-60 (N.Y. Civ. Ct. 2001). Plaintiff bears the burden of proving that proffered repair costs are reasonable. *See Cmty. Ass'n Underwriters of Am., Inc. v. Feliciano*, No. 16-cv-8509 (VB), 2020 WL 5645803, at *2 (S.D.N.Y. Sept. 21, 2020) (citing *Fisher*, 779 N.E.2d at 181); *see also Parilli v. Brooklyn City R.R.*, 260 N.Y.S. 60, 60 (2d Dep't 1932) ("Of course there must be proof that the repairs were necessary and were reasonably worth the sum paid, for without it neither the value of the repairs nor the extent of the injury is thereby established.").

### B. Application

First, the Court must determine whether Plaintiff has carried its burden of establishing that the estimated repair costs propounded by Mr. Cheeseman are reasonable. As discussed above, the Court has found that Mr. Cheeseman's estimate goes far beyond the reasonable cost of repairs. There is no evidence that Mr. O'Hanlon subjected Mr. Cheeseman's estimate to any scrutiny to ensure he was being quoted a competitive and reasonable rate. *See Parilli*, 260 N.Y.S. at 60. Additionally, Mr. Cheeseman's estimate is flawed in that it assumes a worst-case scenario: that once work begins on the damaged portion of the Retaining Wall, "another 10 feet comes down with it." *See* Tr. 79:21-25. Further, Mr. Cheeseman's estimate goes well beyond restoring the Retaining Wall—an over-100-year-old wall that had not been repaired in recent memory, *see* Tr. 7:7-11, 9:2-7, 17:16-21, 18:2-5—to the condition it was in immediately prior to the incident. Indeed, Mr. Cheeseman provided his estimate with an eye towards restoring the Retaining Wall to its "original state." *See, e.g.*, Tr. 48:10-23 (explaining he anticipated the job

12

would require "a little acid washing to get [the stones] back to their original state"). Finally, and importantly, Mr. Cheeseman's estimate is based on the assumption that the December 26, 2019 incident caused a lean in the Retaining Wall that must be repaired. *See* Tr. 40:14-19, 65:8-66:24. This assumption, however, finds no support in the record. Mr. Cheeseman is not an engineer, and while he may have "30 years of experience doing stone work," this does not qualify him to opine as to the cause of structural deficiencies. *See* Tr. 64:6-15, 65:23-66:24. Plaintiff provided no evidence that the lean was caused by the incident, and the fact that the lean was located some 25 to 30 feet away from the damaged corner—with no apparent lean in the wall between the corner and that distant location—indicates that it was not. *See* Tr. 101:9-15; *see also* Defs. Ex. 6 at "Photo Sheet" pgs. 5, 8. In short, the extensive repairs contemplated by Mr. Cheeseman are not provided for under New York law. *See Gass*, 190 N.E. at 324 ("[t]he plaintiff should not benefit by the loss").

Even though Mr. Cheeseman's estimate for the cost of repairs is not reasonable, there is no dispute that some amount of compensation is owed to Plaintiff for the damage caused by the accident. Accordingly, the Court turns to Defendants' evidence, as Defendants effectively have conceded, through the submission of the Fitzpatrick estimate, that they believe that $14,400 is a reasonable cost for the repairs necessary to restore the Retaining Wall to its former condition. *See Fisher*, 779 N.E.2d at 180. As discussed above, the Court credits Mr. Fitzpatrick's testimony concerning the extent of repairs necessary to the Retaining Wall overall, and therefore finds that the $14,400 figure in the Fitzpatrick estimate is appropriate to cover most of the reasonable repair cost for the damage to the Retaining Wall that resulted from the December 26, 2019 incident. That said, Mr. Fitzpatrick's estimate fails to incorporate necessary safety measures. Additionally, Mr. Fitzpatrick's estimate does not account for bringing in additional stone—which both Mr. Cheeseman and Mr. Fitzpatrick testified would be necessary to repair the

13

Retaining Wall. *See* Tr. 47:3-16, 96:2-8. For these reasons, in order to arrive at a reasonable cost to repair the Retaining Wall to its pre-accident condition, the Court finds it necessary to add to Mr. Fitzpatrick's estimate: (1) the estimated cost for flaggers for three days of labor (*i.e.*, the length of time that Mr. Fitzpatrick estimated the repair would take);[6] and (2) the estimated cost for new stone to complete the repair work. The Court has included these additional costs based on the figures provided for these line items in the Cheeseman estimate, having found credible Mr. Cheeseman's testimony regarding the need for these items. *See* Pl. Ex. 2, line 10 ($2,601 for "granite blocks to replace missing section"); Tr. 47:13-16; Pl. Ex. 2, line 6 (flaggers); Tr. 34:17-23, 53:2-54:2.

* * * * * * * * * * *

In total, the Court concludes that Defendants are liable to Plaintiff for damages totaling $22,562.98, as follows:

| Item | Cost |
|---|---|
| Footing, including labor costs of installation | $1,800.00 |
| Labor costs of replacing stones and cement of damaged portion of wall | $9,000.00 |
| Gravel and backfill with drain pipe, including labor costs of installation | $3,600.00 |
| Additional stone | $2,601.00 |
| Flaggers | $5,561.98 |
| **TOTAL** | **$22,562.98** |

---

[6] Mr. Cheeseman estimated that three flaggers working for seven days total would cost $12,977.95. Pl. Ex. 2, line 6. This amounts to approximately $1,853.99 per day, or $5,561.98 for three days. The Cheeseman estimate contemplates that flaggers would be needed only on days when heavy equipment would be needed at the job site, and not on days when only masonry work was being performed. Because of the much more compressed timeframe for the repair job in the Fitzpatrick estimate, the Court concludes that flaggers would be required on each of the three days, as it is unlikely that there would be the same type of "masonry only" days posited by Mr. Cheeseman.

## CONCLUSION

For the reasons stated, Defendants are liable to Plaintiff in the amount of $22,562.98.

The Clerk of Court is respectfully directed to enter judgment in favor of Plaintiff and to close this case.

Dated: December 21, 2023
       White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge